UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                    CR. 01-115(4)(HHK)


            v.                              **UNDER SEAL**

HENRI JAMIOY QUISTIAL


<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF SENTENCE</u>


Henri Jamioy, through counsel, Heather Shaner states the following in support of sentence.  Mr. Jamioy is a member of an indigenous group, the Inga, who historically lived and farmed in the Amazon area of Putumayo.  From the time of his birth onward his land, his community and his family have been under the control of disparate, violent groups--FARC, paramilitary groups, terrorist groups.  There was no government presence in the area.  The "Taita" or spiritual leaders of the community were forcibly removed by armed groups.  Various armed groups forced the Inga from their ancestral lands.  A community of over eighty extended families in the 1970's was reduced to ten partial families by  the year 2000.  There have been  untold numbers of homicides, disappearances, kidnappings and assaults against the Inga and the Jamioy Quistial family dating from 1974 until this year.  In 2006 his Aunt Marta Jamioy, who was herself a human rights worker, was murdered.

I present this information to give the Court a picture of the world into which Henri Jamioy Quistial was born in 1974 when the FARC took over Putumayo.   His life at all times was  dominated by armed conflict, coca cultivation, drug wars  and the  eradication  of  indigenous  culture.

There existed no state in his lands. The "Taitas"--native leaders were forced out.  There was no legal government. No Colombian government presence.   There was no protection for the Inga, the defendant,   nor for Mr. Quistial's family. This is the context to explain how the defendant began working with a group of armed hostage takers.  From his birth on, he was continually exposed to violence. The region was lawless. The pressure from FARC, paramilitary groups and  by other armed groups on the Inga and the defendant may not justify his joining a group --  but in part it does explain his conduct.  In a lawless land it is very difficult --if not impossible--to resist armed coercion.  Mr. Jairo Valencia will address the Court on the circumstances in Putumaya at Sentencing and be available to answer questions.

## 5K1.1

First I would like to address Mr. Quistial's  cooperation.  The parties agree that from the time of his arrest in Colombia in May 2001 he was truthful and forthcoming about his involvement and the involvement of others.  In Colombia  he spoke to FBI agents,  United States Attorneys, investigators and members of the Colombian government.   He was debriefed in Miami as soon as he was extradited to the United States.  He met with AUSA Beasley in Washington, D.C. almost immediately after he was presented in this Court in January  2003.   He entered a plea in February 2003.  He has been debriefed by the government of Colombia as well as the government of the United States on multiple occasions.  His sworn statements  and depositions were used by the prosecutors in Colombia as Trial Testimony.   Based on his cooperation both in Colombia and in the United States the Department of Justice Departure Committee has filed a Motion for Departure. 5K1.1.   The Court has discretion to base its sentence on the factors delineated in 18 U.S.C. 3553 in imposing a just and appropriate sentence.   This is particularly relevant for this offense

and for this defendant because the anthropological and historical factors we are asking the Court to consider place Mr. Quistial outside the "heartland".  His coerced  participation  in the offense and his life history make him an "atypical" defendant.


## **PSR CALCULATIONS**

I will  next address  the Presentence  report calculations  in relevant part.

# 39.    We agree the base level offense is ......................................... 43.

#41      We find no factual nor legal basis for a "hate crime" adjustment.

#42      We will present factual and legal basis for  minor role............-2.

#46      We agree with Acceptance of Responsibility...........................-3.

Offense Level........................................................................................ 38

## ARGUMENT AGAINST §3A1.1(a) ADJUSTMENT

To grant an upward adjustment under §3A1.1(a)  the government must prove beyond a reasonable doubt that " the defendant intentionally selected any victim or property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person."

A hate crime is defined by the U.S. Department of State as bias generated violence.  The crime here, while venal, is not a hate crime. The purpose of the offense  is not to terrorize or traumatize a particular despised group.  The offense of conviction was purely an economic crime---extortion.   The hostages were oil company employees.  They were selected based on their connection to a wealthy international oil company.  The selection of the victims was in order to extort ransom money from the company for their release.

To grant a "hate crime" adjustment  the finder of fact must find beyond a reasonable doubt that the "primary motivation for the offense was the race, color, religion, national origin, ethnicity, gender, disability or sexual orientation of the victim". USSG §3A1.1(a).   There is no evidence the victims were selected based on race or nationality.   There is no evidence the primary motivation was anything other than greed.

According to Count I of the Indictment from 1997 onward armed members of the group seized foreign oil workers for the purpose of collecting a ransom.  That is the primary motivation of the offense.  The offense Quistial is charged with was a hostage taking in 2000.  Twelve oil company workers were seized for ransom.  Five were Americans.  The others were from Ecuador, Argentina, Chile, France and New Zealand. The purpose of the hostage taking was to collect a ransom.

The victims were seized because of their connection to oil company wealth - - not because of bias.   Mr. Sanders was not  intentionally selected by the defendant based on a bias motivation.

According to the government,  Mr. Sanders was selected by the leaders of the group to be turned over to the Red Cross as a show of good faith.   The leaders changed their mind and ordered the group transporting him to the Red Cross to shoot him instead in order to put pressure on the oil company.  It was a negotiating strategy to force the oil company to meet their ransom demands when the leaders felt the oil company was not negotiating in good faith.

Count 8 of the Indictment  states in relevant part that Sanders was taken hostage  in order to compel a third person to . . . pay money as an explicit. .  .condition for the release of the United States nationals and others. It was all about money.   There are no facts upon which the Court can find beyond a reasonable  doubt that this was an offense where the *primary motivation* was hatred of the U.S.  nationality of Mr. Sanders or of the other oil workers.  The note on Mr. Sanders body states "I am a North American.  I was killed because HP (the oil company) did not pay the ransom."  This was an economic crime.  It was not a hate crime.

## MITIGATING ROLE  §3B1.2

Mr. Quistial should be awarded  a downward adjustment based on his limited role in the offense.   According to the discovery, the government proffer and the information from AUSA Beasley  the group of hostage takers was three tiered.  At the top were the leaders and the decision makers.  In the second group were middle men who enforced the decisions of the leaders and told the members of the bottom tier what to do.  At the bottom were the least culpable - - the guards, cooks, and

jungle guides.  Mr. Jamioy Quistial was in the bottom group.  He had no decision making capacity. He gave no orders.  He carried the equipment and did assigned tasks.  Mr. Quistial was important to the group because of his skills in the jungle.    Based on the shorter term of his participation (from October 2000 until March 2001) and his lesser role in the offense Mr. Quistial should receive an adjustment of -2 points under §3B1.2.  Mitigating Role.

The parameters of the conspiracy as outlined in the Indictment give the time period of the armed hostage taking   from August 1997 until June 2001.  Mr. Quistial entered the group in October 2000.  At no time was he in a leadership role.  The top tier set goals, made decisions and gave orders.  They planned the hostage taking.  They negotiated with the oil companies and decided what demands to make and what tactics to use to get the ransom money.  They arranged for payment of the ransom money,  the release of the prisoners and the distribution of the ransom money.  They paid themselves the most money according to their greater role in the offense.

The middle tier was responsible to get materials, obtain food, distribute materials and to assign tasks to the members of the bottom tier.  The middle tier was responsible for training the bottom tier.  The middle tier received less ransom money than the leaders.

Mr. Quistial was in the bottom tier.  As such he followed orders from members of the middle tier and the leaders.   He was trained by the middle tier.  He served as a guide, a guard, a cook and a worker.  He had no decision making responsibility.  He had no input into  the activities, negotiations or planning of the leaders.  He gave no instructions to other members of the conspiracy.  He was a "foot soldier" and as such received the lowest share of the ransom money.  His role was to follow the

commands of his superiors, to carry supplies, to guard and feed the hostages.

We are requesting an adjustment of -2 points pursuant to §3B1.2. He pled guilty to the greatest offense of the concerted conspiracy. He is less culpable than the members of the middle and upper tier of the conspiracy.  His role could not be described as minimal.  Application Note 5.

### FACTORS  THE COURT MAY CONSIDER IN MITIGATION OF   SENTENCE   PURSUANT   TO    18  U.S.C.  § 3553

### 1.  Duress and Coercion

Henri Jamioy Quistial is a member of an Indigenous group -- the Inga.  From the time of his birth until the time he became a member of the group of armed hostage takers his life has been dominated and controlled by violence.   His homeland has been forcibly overtaken by FARC since 1974.  There has been no government protection--no police force--no government army--no human rights office to protect him or his family.   According to Jairo Valencia, an expert on indigenous communities in Colombia- - the defendant was born into armed conflict.  FARC has multiple armed fronts in Putumayo.  There are multiple paramilitary armies in Putumayo.   The historical leaders or "Taitas" have been forcibly removed from their villages.  Whole families have disappeared.   Multiple mass grave sites have been discovered.   Children are kidnapped and forced to join armies.  Young adults are coerced to join armed groups. The forcible invitations cannot be turned down.  So many members of the Inga have been murdered or kidnapped that they have been reduced from 80 families to 10 families.  Members of Mr. Quistial's immediate family have been kidnapped, assaulted and murdered.  His brothers have been killed.  His aunt -- a human rights worker--was killed.  Two teenage nieces

were recently kidnapped.

Beyond the constant threat of violence--the cultural, economic, and moral life of the community has been largely destroyed.   Mr. Quistial was himself in a large sense a victim of the conspirators.  When he was invited to join an armed group  --in the political and social context of life in Putumayo for an Inga--the invitation  could not be turned down without mortal consequences for himself and his family.   Duress and coercion were  vital factors of his participation in the offense. See U.S. v. Ramos-Oseguera,  120 F.3d 1028 (9th C. 1997) (The duress policy statement §5K2.12 allows the Court to consider that under circumstances of coercion or duress the Court may decrease the sentence).

The duress  policy statement  allows that "[i]f the defendant committed the offense because of serious coercion ...or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence.  " See for instance  U.S. v. Meyers, 952 F.2d 914 (6th C. 1992) where the court found serious coercion but not full defense; U.S. v. Amor,  24 F.3d 432, 438-39 (2d  C. 1994)  where the defendant committed a firearms offense where he was  personally threatened, and feared  potential  violence by union in impending strike;  U.S. v. Amparo, 961 F.2d 288, 292 (1st C. 1992)  where in response  to threats by a smuggler the defendant agreed to traffic cocaine.

## 2. Horrific Life History

The Court  may also  consider  the  extraordinary  violence  in  the community to which the defendant was exposed  throughout his life. There has never been a time since his birth when his region was  not engulfed in armed conflict.  His family has been threatened and subjected

to murder, kidnappings and disappearances.  His horrific life history takes him out of the "heartland" of cases.  See for instance  <u>U.S. v. Somerstein,</u> 20 F.Supp. 2d 454 (E.D.N.Y.1998)  where the District Court in fashioning a just sentence found he could not see incarcerating the defendant based on her experiences during the Holocaust in which she lost half her family.

### 3. Super Acceptance of Responsibility

The defendant manifested "Super" acceptance of responsibility. From the moment he was arrested in Colombia the defendant has demonstrated his super willingness to help the government capture and prosecute members of the conspiracy.  He provided names and locations for fugitives who were unknown to the government investigators.  He has supplied information to the U.S. government recently about how to locate an individual in South America the F.B.I. is still seeking.   He has made early and constant efforts to cooperate with authorities.  See for instance <u>U.S. v. Kim,</u> 364 F.3d 1235 (11th C. 2004)  where defendants conduct demonstrated sincere remorse and super acceptance of responsibility.

### 4.  Post Arrest Rehabilitation

His good conduct in prison and his participation in every rehabilitation program offered at CTF may also be considered by the Court.  See  <u>U.S. v. Core,</u> 125 F.3d 74 (2d. C. 1997).

### 5.  Harshness of Incarceration

Mr. Quistial is married and the father of a severely handicapped daughter who lives in Colombia.  His imprisonment in the United States is a much harsher punishment than for a native born  American.  He is actually exiled from his country and completely isolated from his family and friends.  He cannot receive family visits.  He cannot have telephone contact with his family.  For whatever reason his mail has been blocked

for the last six months and he has been unable to communicate with his loved ones at all.  He is not a native speaker of English.  Because he is not a U.S. citizen he will be excluded from many programs in the Bureau of Prisons. Because of the violent nature of the offense of conviction the defendant's classification and placement will be in the most restrictive setting.   The conditions of confinement is a factor the Court may consider in fashioning a just sentence.  See U.S. v. Noriega, 40 F.Supp. 2d 1378n (S.D. Fla. 1999);  McClary v. Kelly, 4 F. Supp.2d 195 ,207 (W.D.N.Y.  1998).

**6.  Destruction of the Defendant's Cultural Heritage**

The defendant's cultural  heritage and the destruction thereof is a factor the Court can consider in fashioning a fair sentence. As Mr. Jairo Valencia will testify, the defendant's homeland and heritage has been destroyed  by  FARC, paramilitary  group  and  coca  cultivation  in  his homeland.   Forced removal of native leaders and destruction of the community has destroyed his cultural heritage.  The adversities of life may justify a modification of the defendant's sentence.   See U.S. v. Decora, 177 F.3d 676 (8th C. 1999)  where the Circuit held that the district judge  with knowledge of the adversities of life on the Indian reservation did not abuse discretion and was correct in modifying the sentence downward based on the difficulty of the life of the defendant on Indian lands.

**7.  To Give the Defendant Credit for Time Served in Colombia**

The plea agreement specifically provides that the defendant be given credit for time served in Colombia prior to being brought to the United States for prosecution.   The Bureau of Prisons will not give credit for this time.  We request that the Court in fashioning a sentence reduce the sentence by 18 months to account for the months he was held by Colombian authorities at the request of the United States prior to being presented in U.S. District Court for the District of Columbia in January 2003.


**WHEREFORE** the defendant respectfully requests the Court grant the 5K1.1 Motion and further take into consideration the factors enumerated above in fashioning an appropriate sentence for Mr. Jamioy Quistial. The defendant accepts responsibility for the wrongfulness of his role in the hostage taking.   He pleads that The Court  consider the coercion and duress of the armed group which compelled his entry into the group, as well as his remorse for his conduct and the valuable cooperation he provided as soon as he was separated from the people who compelled his criminal conduct.

Respectfully submitted,


H. Heather Shaner